Margaret L. LOMAX (Kenner),
Appellant,

v.

Virgil Paul SPRIGGS, Appellee.

No. 13419.

District of Columbia Court of Appeals.

Submitted Sept. 28, 1978.

Decided July 30, 1979.

Rehearing Denied Oct. 16, 1979.

John J. Simard, Washington, D. C., for appellant.

Philip H. Manning, Columbia, Md., for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

NEBEKER, Associate Judge:

The plaintiff appeals from an order quashing a writ of attachment. We reverse in part and remand.

On January 5, 1965, the District of Columbia Juvenile Court ordered the appellee to pay the appellant $7.00 per week for child support. The appellant received some payment, but was prohibited from garnishing the appellee's wages for any deficiency because the appellee was an employee of the United States. In 1975, however, Congress allowed the garnishment of the wages of employees of the United States, where the garnishment is to enforce "legal obligations to provide child support or make alimony payments." Social Services Amendments Act of 1974, Pub.L.No.93–647, § 459, 88 Stat. 2337 (effective July 1, 1975). On January 26, 1978, the appellant filed for a writ of attachment, which was served on the appellee's employer, the United States Court of Appeals for the District of Columbia Circuit. On motion of the appellee and following a hearing, the Superior Court suspended the writ on April 7, 1978, "without prejudice . . . to the filing of a fur-

ther Writ in an amount not barred by Section 15–305 of the D.C.Code and/or a Motion for the Revival of Judgment." A defense of laches, an alternative ground urged for quashing the writ, was not ruled upon.

To summarize the conclusions which will follow, we hold that the writ involved is not a "writ of execution" governed by the three-year period of D.C.Code 1973, § 15–302, and the revival provision of § 15–305, but is a "writ of attachment" governed, *inter alia,* by D.C.Code 1973, § 16–543. Section 16–543 provides that a writ of attachment may be issued in aid of execution during the life of a judgment. We hold that each support payment became a separate judgment as of the date the payment fell due and that the life of each judgment is the twelve-year period specified in D.C. Code 1973, § 15–101, irrespective of whether the judgments are or are not recorded. As to the life of the judgment, § 15–101 specifies that a judgment is in force for twelve years from when "execution might first be issued thereon." We conclude that this period is unaffected by a judgment debtor's wages being immune from garnishment, and therefore the effect of the Social Services Amendments Act of 1974 is irrelevant to the application of §§ 15–101 and –302. Finally, we hold that the Superior Court judge should have reduced the amount of the writ by the sum improperly stated rather than suspend the entire writ. Accordingly, we reverse in part and remand. We express no opinion on the defense of laches, it not having been ruled on at the trial level.

## I. WRIT OF ATTACHMENT DISTINGUISHED FROM WRIT OF EXECUTION

### A. *Functions of the Writ*

■ The writ here in question is a writ of attachment. However, it was upon the basis of D.C.Code 1973, §§ 15–302, –305, that the Superior Court judge suspended the writ. Section 15–302 states in pertinent part:

(a) A writ of execution on a judgment in a civil action may be issued within three years after:

\* \* \* \* \* \*

(2) it first might have been issued under applicable provisions of law or rules of court.

Section 15–305 states:

A writ of execution not issued within the time allowed therefor, may not be issued until the judgment has been revived. The same rule applies to the order of revival in relation to the issuance of a writ of execution as to the original judgment.

The writ in question is titled "writ of attachment" rather than "writ of execution," to which both of the above sections refer. The writ does not purport to disburse the wages to the judgment creditor, but requires the garnishee to pay certain wages to the Clerk of the Family Division of the Superior Court. It, therefore, maintains the status quo pending a decision by the court as to whether to disburse the funds into the hands of the awaiting judgment creditor.[1] Accordingly, the writ in issue is not a "writ of execution," governed by §§ 15–302 and –305, but a writ of attachment, governed, *inter alia,* by D.C.Code 1973, § 16–543, which provides:

Attachment may be issued at any time during the life of the judgment, without issuing an order reviving the judgment previously thereto.

Therefore, the three-year period relating to the issuance of a writ of execution is irrelevant to the issue of whether the writ of attachment properly issued.[2]

---

1. We note that the court, in essence, has made a decision to disburse the funds absent a showing of good cause to the contrary, in cases of maintenance, alimony, support, care and education." Super.Ct.Dom.Rel.R. 403; *see generally* D.C.Code 1978 Supp., § 16–911. It is the rule rather than the writ of attachment, however, which effects the disbursal to the judgment creditor. The rule appears to be implicitly limited to funds regarding judgments on which execution may be had. *See, e. g.,* D.C. Code 1973, § 15–302.

2. Despite the relevance of § 16–543, neither of the parties cited the section to the motions

While the above paragraph alludes to the distinction between a writ of execution and a writ of attachment, an appreciation of the origins of the two writs is essential to a firm understanding for the basis of our ruling. The sections quoted above date back to the first code adopted by the Congress for the District in 1901. *See* D.C. Code 1901, §§ 1074, 1078, 1087 (31 Stat. 1358–59). As the Code has been updated, the essence of the sections has been preserved, although the wording and positioning within the Code have been somewhat altered.[3] A view of the law as it appeared to the courts and writers of the time provides the key to our understanding now.

At early common law, apart from the "original writ" as a means of compelling the appearance of the defendant,[4] various judicial processes were employed. One such process was the writ of attachment, then called a writ of *pone per vadium*.[5] By this writ the sheriff was commanded to secure the appearance of the defendant by two alternative means. He could seize the defendant's goods (gage), which would be forfeited upon non-appearance, or require the defendant to find sureties (safe pledges),

who would be fined upon the defendant's failure to present himself as directed.[6] Obedience to the court dissolved the writ; the writ did not secure any debt resulting from a judgment.[7]

■ From this beginning, the writ of attachment evolved to a point where its main purpose is to secure the debt or anticipated debt.[8] Under the forerunner of the 1901 District of Columbia Code, plaintiffs in the District's courts were allowed the option of attaching the defendant's credits or goods following judgment, rather than immediately executing on the judgment.[9] Whereas a writ of execution following a default judgment and a pre-judgment writ of attachment required an undertaking,[10] a post-judgment writ of attachment required no security.[11] Because a writ of attachment ordered the marshal to notify the defendant of the attachment of his property and of the defendant's duty to appear in court and show why the property "should not be condemned, and execution thereof had been made,"[12] an additional opportunity was afforded the defendant to demonstrate that

---

judge. On appeal, the appellant quotes the section near the conclusion of her three-page brief, but does not discuss it. The appellee's brief fails to mention § 16–543. While we are puzzled at counsel's reticence to come to grips with the applicability of the section, we nevertheless hold that it is controlling here.

3. *E. g., compare* D.C.Code 1901, § 1074, *with* D.C.Code 1973, § 15–302. While in the original enactment the sections appeared within the same chapter, titled "Execution," the sections dealing with execution currently appear in a separate title from those dealing with attachment. Nevertheless, there is no indication that the substance or intent of the sections has been altered since 1901. *See* D.C.Code 1973, § 16–501, revision notes.

4. *See* H. Stephen, Principles of Pleading 41 (3d American ed. 1919).

5. Black's Law Dictionary 1321 (4th ed. 1951) (name derived from the words of the original writ *"pone per vadium et salvos plegios,"* meaning "put by gage and safe pledges").

6. R. Perry, Common-Law Pleading 148–49 (1897).

7. B. Shipman, Common-Law Pleading 20 (1923).

8. *Id.; see* Act of June 1, 1866, ch. 103, § 1–5, 14 Stat. 54 (third alternative condition allowing issuance of writ of attachment is affidavit stating defendant "has removed or is about to remove some of his property from the District, so as to defeat just demands against him"; judgment may be satisfied by executions on attached things); Compiled Statutes in Force in the District of Columbia, ch. LV, § 107 (1894) (upon defendant not appearing, court may condemn the attached goods, credits or chattels and issue a writ of execution).

9. Compiled Statutes, *supra* § 110.

10. Act of June 1, 1866, ch. 103, § 1, 14 Stat. 54 (prejudgment writ of attachment requires "sufficient surety"; Compiled Statutes, *supra* § 107 (writ of execution requires "sufficient security" for issuance).

11. Compiled Statutes, *supra* § 110.

12. *Id.*

any execution would be a mistake.[13] Under the current code, property is attached to provide assurance that the judgment will be satisfied. The attachment guarantees the judgment creditor security while significantly reducing the potentiality for liability due to wrongful execution.

In contrast to a writ of attachment, which freezes or seizes property to maintain the status quo, a writ of execution is the means by which a judgment is satisfied. By execution, a judgment debt is discharged. The parties are placed in the position mandated by the judgment. As explained by a scholar who published contemporaneously with the original enactment of the code provisions presently in dispute:

Upon judgment, the successful party is, generally, entitled to execution, to put in force the sentence that the law has given. For this purpose he sues out a writ, addressed to the sheriff, commanding him, according to the nature of the case, either to give the plaintiff possession of the lands, or to enforce the delivery of the chattel which was the subject of the action, or to levy for the plaintiff the debt or damages and costs recovered, [and] in some cases, upon his body, lands, and goods . . . .[14]

While D.C.Code 1973, § 15–302 is written in terms of "[a] writ of execution," there were at common law, and are today, several writs of execution.[15] While particular writs may have been modified in form and pur-pose,[16] the purpose of the writs, to place the parties in the relative positions mandated by the judgment, has endured the modifications. A writ of execution is to discharge the judgment.

Through the morass of the Latin phrases and the obtuseness of the antiquated sentence structure, the point to be gleaned is the difference between a writ of attachment, by which assets are frozen, and a writ of execution, by which assets are transferred from the judgment debtor to the judgment creditor. As the functions of the writs are different, so are there differences in the time limitation, relative to the judgment, governing their issuance.

### B. *Time for Issuing Each Writ*

A writ of attachment may be issued before judgment or at any time while the judgment is in force.[17] Thus, a person having a claim, whether or not reduced to a judgment, may reasonably assure himself of satisfaction by "freezing" property. For example, a writ of attachment may be obtained under D.C.Code 1973, § 16–501(d)(3), where a defendant "is about to remove . . . his property from the District." The same principle holds true following a judgment: so long as the judgment is in force, a writ of attachment may issue on it. The delay required to revive a judgment so that a writ of execution may issue,[18] may be of sufficient length to allow the defendant ample opportunity to secrete or dispose of his assets. *See, e. g., Harper*

---

**13.** *Cf.* D.C.Code 1973, § 16–501 (bond required for prejudgment attachment).

**14.** R. Perry, Common-Law Pleading 221 (1897).

**15.** For example, under a writ of *fieri facias,* personal property was taken into the actual possession of the marshal (real property was taken as prescribed by statute), and sold, and the proceeds were paid to the plaintiff. B. Shipman, Common-Law Pleading 51 (1923). The present code expressly refers to a writ of *fieri facias, see, e. g.,* D.C.Code 1973, §§ 15–307, –308, –311, –312, and acknowledges that other writs of execution also exist. *See id.,* § 15–308 (requiring the marshal to endorse "any writ of fieri facias *or other writ of execution*" (emphasis added)). Under the current law, a court may require the marshal to place a party in possession of real property under a "writ of habere facias possessionem." *Id.,*

§ 15–318; *cf.* B. Shipman, Common-Law Pleading 51 ("writ of possession").

**16.** *See, e.g., Beebe v. United States,* 161 U.S. 104, 16 S.Ct. 532, 40 L.Ed. 633 (1896) (substitution of a second or *"alias"* writ of *fieri facias* for a writ of *venditioni exponas* was proper despite property having been previously levied upon—but not sold for lack of time to advertise—under a previous writ of *fieri facias* ).

**17.** D.C.Code 1973, §§ 16–501, –543. *Cf.* D.C. Code 1901, §§ 445, 1087 (31 Stat. 1258–59, 1359).

**18.** *See generally* D.C.Code 1973, §§ 15–302, –305 (beyond three years, judgment must be revived before writ of execution will issue).

*v. Cunningham,* 8 App.D.C. 430 (1896) (second reported appeal in proceeding begun in 1890 to revive a judgment). Therefore, essentially no limit is fixed on the time for attachment in anticipation of satisfying a viable claim.

The time period following a judgment during which a writ of execution may issue is shorter than that during which a writ of attachment may issue. The basis for the restriction is the presumption that following a certain amount of time after judgment, the judgment has been satisfied.[19] At common law, the period of time was a year and a day. The period was codified and in force from the formation of the District in 1801 until the adoption of the 1901 code.[20] With the adoption of the 1901 code, the period became: within three years from the judgment or, if the right to execute is suspended, "within three years after the removal of the suspension."[21] Thus, unless the presumption that the judgment has been satisfied has been rebutted by the revival of the judgment, a judgment creditor may have an "enforceable judgment."[22] The prima facie conclusion is also rebutted by a writ of execution having been issued and returned unsatisfied within the three-year period.[23]

### C. *Conclusion*

■ In short, there is a distinct difference between a writ of execution and a writ of attachment. The time periods governing the issuance of each are of different length by design. Surprise is often the key to a successful attachment, whereas notice is the touchstone to execution. The writ here in question is a writ of attachment because it maintains the status quo. It directs the

appellee's employer to divert certain of the appellee's wages to the clerk of the Superior Court. This diversion does not satisfy the judgment. The writ does not direct the wages to be paid to the appellant. Therefore the writ is *"in aid of* execution,"[24] but not a writ *of* execution. (Emphasis added.)

## II. INTERPRETATION OF D.C.CODE 1973, § 16–543

Having held that the writ at issue is a writ of attachment, we turn now to the interpretation of D.C.Code 1973, § 16–543, which governs the issuance of a writ of attachment. That section provides: "Attachment may be issued at any time during the life of the judgment, without issuing an order reviving the judgment previously thereto." The facts in this case raise two issues. First, what is the judgment or judgments which the appellant received? Second, what is the life of that judgment or judgments?

### A. *Judgment*

■ We hold that each periodic payment for support becomes a separate money judgment as of the date of its accrual. In *Kephart v. Kephart,* 89 U.S.App.D.C. 373, 193 F.2d 677 (1951), addressing the issues of whether alimony and child support arrearages need be reduced to a "money judgment" prior to execution issuing and whether arrearages may be retroactively modified, the circuit court held "that an award of alimony is a judgment for money, on which execution may issue . . . . Each installment which matures under a decree which has not been modified becomes a judgment debt similar to any other

---

**19.** *E. g.,* B. Shipman, Common-Law Pleading 52 (expiration of designated period is prima facie conclusion that the judgment is "satisfied and extinct").

**20.** Compiled Statutes, *supra* at 288–289 (execution to issue within a year from the expiration of any stay).

**21.** D.C.Code 1901, § 1074 (31 Stat. 1358). *Cf.* D.C.Code 1973, § 15–302.

**22.** *See* D.C.Code 1973, § 15–101 (life of judgment is twelve years, upon which he cannot execute); *see* D.C.Code 1973, § 15–302 (writ of

execution may be issued for a three-year period).

**23.** *See* D.C.Code 1973, § 15–303 (alias writ of execution may be issued any time during the life of a judgment).

**24.** D.C.Code 1973, §§ 16–541 to –556 (sections comprise "SUBCHAPTER II" which is entitled "ATTACHMENT AND GARNISHMENT AFTER JUDGMENT IN AID OF EXECUTION").

judgment for money." [25] The appellant contends that the periodic amounts accrue into an ever increasing "money judgment" as of the date of the latest accrual. We reject this "snowball" theory because a fair reading of *Kephart* reveals that it does not stand for this proposition and because such a rule. would defeat the objectives of the time limitations on the execution on judgments and on the life of judgments. Under this theory, a judgment for periodic payments would be immortal.

### B. *Life of Judgment*

■ The life of the judgments here in question is twelve years "from the date when an execution might first be issued thereon." D.C.Code 1973, § 15–101. As is discussed below, implicit in this holding are the conclusions that the life of an unrecorded judgment is twelve years and that execution may issue on a judgment, under the law, despite a judgment debtor's wages being immune from attachment (garnishment).

### 1. *Effect of Recordation on Life of Judgment*

■ The life of recorded and unrecorded judgments is equal: twelve years from when execution might first have issued. *See* D.C.Code 1973, § 15–101. The appellee contends that § 15–101 does not govern the appellant's judgment, which, on the record before us, is unrecorded. Instead, the appellee urges, the life of an unrecorded judgment is prescribed by § 15–302: three years. Section 15–302 has been quoted *infra* at p. 945. Section 15–101 reads as follows:

> Enforceable period of judgments; expiration

(a) . . . [E]very final judgment or final decree for the payment of money rendered in the:

(1) United States District Court for the District of Columbia; or

(2) Superior Court of the District of Columbia, when filed and recorded in the office of the Recorder of Deeds of the District of Columbia, is enforceable, by execution issued thereon, for the period of twelve years only from the date when an execution might first be issued thereon, or from the date of the last order of revival thereof. The time during which the judgment creditor is stayed from enforcing the judgment, by written agreement filed in the case, or other order, or by the operation of an appeal, may not be computed as a part of the period within which the judgment is enforceable by execution.

An examination of § 15–302 in juxtaposition with a repealed section of the code leads to the conclusion that § 15–302 does not govern the life of unrecorded judgments. Furthermore, while by its terms § 15–101 appears to apply only to judgments of the two specified courts which are "filed and recorded in the office of the Recorder of Deeds," when viewed in the context of the evolution of § 15–101 and certain related sections of the code and their legislative history, § 15–101 is a firm indicator that the life of an unrecorded judgment is also twelve years.

### a. *Examination of § 15–302*

■ The earliest statutory forerunner of § 15–101 provided for judgments of the District of Columbia Juvenile Court and other trial courts, which later became the District of Columbia Superior Court, to be docketed in the Supreme Court of the District of Columbia, which later became the

---

**25.** *Id.* 89 U.S.App.D.C. at 377, 381, 193 F.2d at 681, 684. *See Farmers and Merchants Trust Co. v. Madeira,* 261 Cal.App.2d 503, 516, 68 Cal.Rptr. 184, 193 (1968) ("when a judgment or order provides for periodic child support payments the applicable statute of limitations [on foreign judgments] runs against each installment as if [*sic*] falls due"); *Riney v. Riney,* 205 Kan. 671, 473 P.2d 77, 80–81 (1970) (in proceeding to revive judgment, arrearages treated as judgments as of date of accrual); *Slade v. Slade,* 81 N.M. 462, 464, 468 P.2d 627, 629 (1970) (in judgment for periodic payments, each "payment becomes vested when due and unpaid, and the statute of limitations [to enforce judgment] begins to run on that installment at the moment it vests").

United States District Court for the District of Columbia. Under § 1212 of the 1901 District Code, these judgments, when docketed, were enforceable for twelve years.[26] The same section provided that a judgment of a justice of the peace was on equal footing with a Supreme Court judgment when "certified to and docketed in the clerk's office of said Supreme Court." D.C. Code 1901, § 1212. Thus, the Supreme Court judgments were not required to be recorded, and the justice court judgments were recorded or docketed in the Supreme Court. The Juvenile Court of the District, which rendered the 1965 judgment ordering the support payments, was established by Congress in 1906.[27] As of the time the support payments were ordered, it stood in somewhat the same position vis-a-vis the United States District Court for the District of Columbia as had the justices of the peace vis-a-vis the Supreme Court. D.C.Code 1961, § 11–959 provided:

> The Juvenile Court of the District of Columbia is hereby empowered after such notice and hearing to reduce to judgment the arrears under any order hereafter entered for the support and maintenance of a child born out of wedlock, or any amounts ordered to be paid by the defendant under this subchapter; and when docketed in the clerk's office of the United States District Court for the District of Columbia such judgment shall have the same force and effect as judgments of the United States Court for the District of Columbia and execution thereon may be affected in the same manner as upon judgments of the said district court.

So far as the record reveals, however, no judgment for arrearages was ever entered and therefore none was available for docketing in the District Court. Although one may query concerning the effect of docketing the support order in the District Court and the result of not having done so, the issue need not be decided here.[28] The point to be noted is that a Juvenile Court judgment was not on equal footing with a District Court judgment until it had been docketed in the District Court.

Congress' enactment of a six-year life for unrecorded judgments of the predecessors of the Superior Court indicates that the three-year period of § 15–302 does not govern the life of unrecorded judgments.

The Municipal Court succeeded the justices of the peace,[29] and was in turn succeeded by the Court of General Sessions.[30] At the time the support order was rendered, the Court of General Sessions occupied a position analogous to the Juvenile Court insofar as the docketing of judgments was concerned. In 1965, when the support judgment was entered, the following code provision was in effect:

> A judgment entered by the District of Columbia Court of General Sessions shall remain in force for only six years, unless it is docketed in the office of the clerk of the United States District Court for the District of Columbia. Upon being so docketed, the judgment has the same force and effect for all purposes as if it were a judgment of the District Court, and, until it is so docketed, it does not become a lien upon any real property in the District.[31]

Docketing a judgment of the Court of General Sessions was designed to extend the life of the judgment and to create a lien.[32] Docketing judgments of the Juvenile Court in the District Court appears to have been designed for the same purpose. Section 15–132 also established a time period different for unrecorded judgments than for recorded judgments, when read in conjunction

---

26. See text following note 36 *infra*.

27. Act of March 19, 1906, ch. 960, § 1, 34 Stat. 73.

28. See note 48, *infra*.

29. See Act of Feb. 17, 1909, ch. 134, 35 Stat. 623; Act of April 1, 1942, 56 Stat. 190.

30. Act of July 8, 1963, 77 Stat. 77. The Court of General Sessions was later replaced by the Superior Court.

31. D.C.Code 1966 Supp., § 15–132(a).

32. *Paley v. Solomon*, 59 F.Supp. 887, 889 (D.D. C.1945).

with D.C.Code 1966 Supp., § 15–101 (twelve-year life for recorded judgments). Both periods were different than the three-year period governing the issuance of a writ of execution,[33] and were identical to the period during which a writ of attachment would issue in aid of execution.[34] Thus, as of the time the support order was entered, the life of an unrecorded judgment of the Juvenile Court was governed by a six-year period rather than, as the appellee now claims, by the three-year period governing the issuance of writs of execution. There is no indication that Congress, subsequent to the time the support order was entered, intended the § 15–302 three-year period to govern the life of unrecorded judgments. Indeed, a reading of the legislative history concerning the 1971 repeal of the six-year provision would indicate the contrary.

b. *Evolution of § 15–101 and Related Laws*

■ The evolution of § 15–101, in conjunction with the statute repealing the six-year period, indicates that the life of an unrecorded judgment is twelve years. Accordingly, we hold that the repealing act extended, from six years to twelve years, the life of any recorded judgment which, at the effective date of the act, had not expired under the six-year rule. The legislative history of the bill repealing the six-year period governing the life of unrecorded judgments indicates that Congress intended the life of all judgments of the Superior Court and the District Court, whether recorded or unrecorded, to be twelve years in length.[35] Congress repealed the provision relating to the life of an unrecorded judgment by the District of Columbia Court Reform and Criminal Procedure Act of 1970.[36] The House Report [37] states

that the relevant section of the 1970 Act "applies the same provisions for enforcement of judgments to both Federal and local courts in the District and repeals the separate provisions relating to the local courts." [38] As shown in the following paragraphs, the life of a judgment of the District Court and its predecessor has always been twelve years, regardless of whether the judgment was or was not recorded.

Through 1967, life of a judgment of the United States District Court and its predecessor clearly was twelve years from when "execution might first be issued thereon," regardless of recordation. At the formation of the District of Columbia, the life of all judgments was twelve years, as provided for by chapter 23 of the 1715 Maryland Act.[39] The Maryland Act provided, "[That] no bill, bond, [or] judgment . . . shall be good and pleadable, or admitted in evidence . . . after . . . . the . . thing in action [has been] above twelve years' standing." [40] As mentioned above, the 1901 District code applied the twelve-year rule particularly to the Supreme Court of the District of Columbia, which preceded the United States District Court:

Sec. 1212. Limitations.—Every final judgment at common law and every final decree in equity for the payment of money rendered in the supreme court of the District, and every judgment of a justice of the peace certified to and docketed in the clerk's office of the said supreme court, as herein elsewhere directed, shall be good and enforceable, by an execution issued thereon, for the period of twelve years only from the date when an execution might first be issued thereon, or from the date of the last revival thereof under fieri facias, except as provided in

**33.** D.C.Code 1961, § 15–201 (now codified at D.C.Code 1973, § 15–301).

**34.** D.C.Code 1961, § 15–302 (attachment may be issued any time during life of judgment).

**35.** *See* H.R.Rep.No.91–907, 91st Cong., 1st Sess. 164 (1970).

**36.** Pub.L.No.91–358, 91st Cong., 1st Sess. 164 (1970).

**37.** *Supra*, note 34.

**38.** *Id.* at 164.

**39.** *See generally* D.C.Code 1973, § 49–301.

**40.** Compiled Statutes in force in the District of Columbia, ch. XLII, § 8. *See, e. g., Mann v. Cooper*, 2 App.D.C. 226, 234 (1894).

the next section; but the time during which the judgment creditor is stayed by agreement in writing filed in the cause, or injunction, or other order, or by the operation of an appeal from enforcing the judgment is not to be computed as part of said period of twelve years.

By 1967, the statute had been amended to reflect the evolution of the justice courts into the Court of General Sessions, and the Supreme Court into the United States District Court. The place for docketing the local court judgments had changed from the United States District Court to the office of the Recorder of Deeds. The section had been renumbered and read as follows:

§ 15–101. Enforceable period of judgments; expiration

(a) Except as provided by subsection (b) of this section, every final judgment or final decree for the payment of money rendered in this:

(1) United States District Court for the District of Columbia; or

(2) civil division of the District of Columbia Court of General Sessions, when filed and recorded in the office of the Recorder of Deeds of the District of Columbia—

is enforceable, by an execution issued thereon, for the period of twelve years only from the date when an execution might first be issued thereon, or from the date of the last order of revival thereof. The time during which the judgment creditor is stayed from enforcing the judgment, by written agreement filed in the case, or other order, or by the operation of an appeal, may not be computed as a part of the period within which the judgment is enforceable by execution.

The clause referring to recordation applied only to the local court, as had been the case since the 1901 code. Only the life of a judgment of a local court was affected by recordation; the life of the District Court judgment was always twelve years.

In 1968, Congress amended the District code "[t]o provide that a judgment or decree at the United States District Court for the District of Columbia shall not constitute a lien until filed and recorded in the office of the Recorder of Deeds of the District of Columbia."[41] Theretofore, judgments of the local courts became liens only when docketed in the District Court (or its predecessor) or after 1966, recorded in the office of the Recorder of Deeds.[42] As of 1967, one searching for a lien was obliged to search in the Recorder's office and the District Court Clerk's office. By the 1968 act, Congress specified a single office for all recordings: the office of the Recorder of Deeds.[43] Congress thereby placed the judgments of federal and local courts on equal footing, so far as their effect as liens on land were concerned.[44] Recordation or docketing has not been required, prior to execution on personal property.[45] As to executing on real property, recordation was made a prerequisite to execution on realty for the District Court as well as the Court of General Sessions.[46] Section 15–101 was amended to read thus:

(a) Except as provided by subsection (b) of this section, every final judgment or final decree for the payment of money rendered in the—

(1) United States District Court for the District of Columbia; or

(2) District of Columbia Court of General Sessions—

when filed and recorded in the office of the Recorder of Deeds of the District of

---

**41.** Act of March 11, 1968, Pub.L.No.90–263, 82 Stat. 42 (preamble).

**42.** *See* Act of Nov. 2, 1966, Pub.L.No.89–745, § 1(a), 80 Stat. 1177, 1178 (amended "when certified to and docketed in the clerk's office of the District Court" to read "when filed and recorded in the office of the Recorder of Deeds of the District of Columbia"); S.Rep.No.342, 90th Cong., 1st Sess. 1–2 (1967).

**43.** H.R.Rep.No.905, 90th Cong., 1st Sess. 2 (1967) ("bill intended to centralize the recordation in" Recorder's office).

**44.** *See* D.C.Code 1973, § 15–102.

**45.** *See* D.C.Code 1973, § 15–311 (first sentence of section).

**46.** *See id.,* § 15–311 (second sentence of section).

Columbia, is enforceable, by execution issued thereon, for the period of twelve years only from the date when an execution might first be issued thereon, or from the date of the last order of revival thereof. [Remainder of text unchanged by 1968 amendment.] [47]

The clause of § 15–101 referring to recordation was made applicable to the federal court, whereas before it had been applicable only to the District of Columbia court, as was intended. Inadvertently, however, the amendment reworded the code to imply that unless a District Court judgment was recorded with the office of the Recorder of Deeds it was not valid for the twelve-year period. This implication was not intended by Congress and we hold that no such limitation was placed on the life of a District Court judgment by the 1968 act.

 That the Act of March 11, 1968, did not limit the life of unrecorded District Court judgments is demonstrated by viewing the legislative history of the act. It is devoid of reference to altering the life of an unrecorded District Court judgment.[48] By contrast, the history is replete with references inferring that the sole purpose of the statute was to make the recording requirements for the local and federal court uniform for lien purposes.[49]

Thus, the 1968 act, which seemingly altered specified differing periods of life for recorded and unrecorded judgments of the District Court, did not effect the life of judgments. Therefore, the twelve-year life

prescription regarding a federal court judgment, which clearly existed from the formation of the District through 1967, continues in force today. It follows that when Congress repealed the six-year life of unrecorded local court judgments by the 1970 Court Reform Act, intending to confer upon the local court judgments the same longevity as the judgments of the federal courts had theretofore enjoyed, Congress prescribed a twelve-year period for the life of all judgments rendered by trial courts sitting within the District of Columbia. Accordingly, the recordation of the original support payment order, or the judgments which came into existence as unpaid amounts fell due, has no effect upon their lives so far as we are here concerned.[50]

### 2. Effect of Inability to Garnish Wages on Life of Judgment

 The appellant's inability to garnish the wages of the appellee until the effective date of the Social Services Amendments Act of 1974 has no effect upon the life of the judgments upon which the appellant seeks ultimately to execute and no effect upon the necessity to revive a judgment prior to issuing a writ of execution, according to D.C.Code 1973, §§ 15–302, –305. So far as we are concerned, the time periods specified in §§ 15–101 (life of judgment) and –302 (time during which writ of execution may issue), begin at the same moment: when execution might first issue on the judgment. As the appellant has advanced

---

**47.** D.C.Code 1969 Supp., § 15–101.

**48.** See, H.R.Rep.No.905, 90th Cong., 1st Sess. 1–6 (1967); S.Rep.No.342, 90th Cong., 1st Sess. 106 (1967); 114 Cong.Rec. 4546, 4703, 6145 (1968); 113 Cong.Rec. 15723 (1968).

**49.** E. g., 113 Cong.Rec. 415603 (daily ed. Nov. 20, 1967) (remarks of Rep. Whitener: "It merely brings about uniformity").

**50.** While the six-year life of unrecorded judgments may be relevant in other cases, it is irrelevant here because the plaintiff's writ was filed more than six years following the effective date of the Court Reform Act, February 1, 1971. Pub.L.No.91–358, § 199, 84 Stat. 597. The appellant's writ was filed on January 26, 1978. Therefore, the twelve-year period of

D.C.Code 1973, § 15–101, extends back only to 1966. An unrecorded judgment rendered in 1966 would have expired by February 1, 1971, when Congress repealed the six-year period for unrecorded judgments. At the outset of the preceding subsection, we held that the life of any judgment that had not expired as of Feb. 1, 1971, became, on that date, twelve years from when execution first might have issued. Therefore, any support judgment which is not barred by § 15–101 may possibly be barred from execution by reason of having expired prior to February 1, 1971. We therefore need not rule on the effect of the 1970 act on unrecorded judgments upon which execution may first have issued six years prior to the 1971 date.

arguments directed at § 15–302, this opinion will·first address the effect of the Social Services Amendments Act on that section, and will then address the Act's impact on § 15–101. As all the relevant sections have been quoted previously, they will not be quoted here.

■■■ The appellant's inability to garnish the wages of the appellee is irrelevant to a ruling on timeliness under § 15–302. The appellant correctly states that the appellee's wages were not subject to garnishment prior to July 1, 1975, because he was an employee of the United States. As of July 1, 1975, by the Social Services Amendments Act of 1974, the United States consented to the garnishment of the wages of its employees where the garnishment is to enforce "legal obligations to provide child support or make alimony payments." [51] The appellant contends that a writ issued within three years after she could first have garnished the wages would have issued within the time constraints imposed by § 15–302 of the 1973 District code. To employ the words of the statutes, the question presented is whether "applicable provisions of law," as used in § 15–302, includes law relating to the legality of serving a writ upon the United States. We hold that the statutory phrase is not so broad.

Section 15–302(a) is designed to pretermit the possibility of a stay preventing execution on the judgment during the prescribed three-year period. Thus, the period begins to run, for example, under Super.Ct.Civ.R. 58, only after the judgment has been entered. "In clause (2) [of § 15–302(a)], the reference to 'law' is inserted for the purpose of covering cases of stay, if any, not covered by the rules . . . ." [52] Therefore, "applicable provisions of law" would not include the 1974 Social Services Amendments Act. The phrase relates to the status or quality of the judgment rather than to

the subject of a possible writ of execution on the judgment.

Our interpretation draws support from the predecessor of § 15–302, which was § 15–201 of the 1961 code. [53] In relevant part, it stated that an execution may be suspended only "by agreement or by an injunction or by an appeal operating as a supersedeas." The three-year period during which the writ must be issued, began running at "the rendition of the judgment" or, if suspended by one of these means, at "the removal of the suspension." [54] The revised section was written "to omit obsolete or superseded matter, and to . . . conform with rules of court adopted since § 15–201 was enacted in 1901." *Id.* The former section was not so broad as to afford plaintiff her claimed relief here and the revision committee does not appear to have intended a substantive enlargement in addition to its updating. Our narrow reading of the present section, D.C.Code 1973, § 15–302(a)(2), therefore, appears correct.

■■■ The· thrust of our analysis interpreting § 15–302 is also applicable to § 15–101. Section 15–101 states, "[f]rom the date when an execution might first be issued"; § 15–302 states, "[A]fter [a writ of execution] first might have been issued." Under the facts before us, there is no reason to not treat the phrases as equals. Under this interpretation, the life of a judgment may be ascertained by regarding the record and the provisions of law concerning execution and stays of execution. Were we to interpret the sections in the manner that the appellant suggests the ease of determining the viability of a judgment would be undercut. No longer would the life of all judgments be of approximately equal length from the time they were rendered, but the length of each would vary depending upon various facts and law extraneous to the record. Thus, even if the appellant

---

**51.** Social Services Amendments Act of 1974, Pub.L.No.93–647, § 459, 88 Stat. 2337 (effective July 1, 1975).

**52.** H.R.Rep.No.377, 88th Cong., 1st Sess. A90 (1963); S.Rep.No.743, 88th Cong., 1st Sess. 98 (1963).

**53.** *See generally* Act of March 3, 1901, ch. 854, § 1074, 31 Stat. 1358.

**54.** *Id.* at A89; S.Rep.No.743, 88th Cong., 1st Sess. 97 (1963).

had made a showing that *all* of the appellee's assets were immune from attachment in aid of execution until the effective date of the Social Services Amendments Act, we would not hold that the Act extended the periods prescribed by §§ 15–101 and –302.

### III. REMEDY

Whereas the trial judge suspended the writ without prejudice, a more equitable remedy would have been to reduce the amount of the writ to a proper sum. Where, as here, the proper amount is readily computable by examining the original support order, the relevant statutes and rules and the calendar, there is nothing to be gained by putting a party to the time and expense of filing for another writ. Furthermore, requiring the issuance of another writ may penalize the attachment party by removing from its grasp the power to attach an installment on which execution might first have been issued within twelve years of the date on which the first writ was issued, but not within twelve years of the date on which the second writ was issued. *See* D.C.Code 1973, § 15–101. The proper remedy, therefore, is to suspend only the improper amount of the writ.

Accordingly, the suspension order is reversed insofar as it applies to the arrearages which are not barred by law as explained above.

*So ordered.*